**FILED**

1  BENJAMIN B. WAGNER
   United States Attorney
2  SHEILA K. OBERTO
   KIRK E. SHERRIFF
3  Assistant U.S. Attorneys
   2500 Tulare Street
4  Suite 4401
   Fresno, California 93721
5  Telephone: (559) 497-4000

MAR 1 7 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
           DEPUTY CLERK

6

7              IN THE UNITED STATES DISTRICT COURT FOR THE

8                     EASTERN DISTRICT OF CALIFORNIA

9

10  IN THE MATTER OF SEARCHES OF: )    1:09 S.W. NO. 00090 SMS
                                  )
11                                )    ORDER GRANTING GOVERNMENT'S
    604 Charles Street,           )    MOTION FOR PARTIAL
12  Arvin, California, and        )    UNSEALING OF SEARCH WARRANT
                                  )    AFFIDAVIT and SEARCH
13  420 5th Street,               )    WARRANTS
    Arvin, California.            )
14                                )
                                  )
15  _____  )

16

17       The search warrant affidavit in this case having been

18  sealed by Order of this Court on April 13, 2009, and it

19  appearing that the portions of the affidavit relating to the

20  properties located at 604 Charles Street, Arvin, California and

21  420 5th Street, Arvin, California (collectively, "Properties"),

22  and the search warrants for the Properties are not required to

23  remain secret based upon the motion submitted by the United

24  States,

25       IT IS HEREBY ORDERED that the portions of the search

26  warrant affidavit relating to the Properties as set forth in

27  Exhibit "A" attached hereto, and the search  warrants for the

28  ///

                               1

Properties be unsealed and made public record.

DATED: March 17, 2010

_____
UNITED STATES MAGISTRATE JUDGE
SM SNYDER

# EXHIBIT "A"

AO 106 (Rev. 12/03) Affidavit for Search Warrant 8/07

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)



**604 CHARLES STREET
ARVIN, CALIFORNIA**

**420 5ᵗʰ STREET
ARVIN, CALIFORNIA**



## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

Case Number:

1: 0 9 SW   0 0 0 9 0 SMS

**ORIGINAL
FILED**

APR 1 3 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

I,  Carlos Quirarte  being duly sworn depose and say:

I am a(n) Special Agent with the Internal Revenue Service, Criminal Investigations and have reason to believe that
☐ on the person of or ☒ on the property or premises know as (name, description and/or location)

## SEE ATTACHMENTS A

in the _____ EASTERN _____ District of _____ CALIFORNIA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

## SEE ATTACHMENT B

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

(1) property that constitutes evidence of the commission of a criminal offense; (2) contraband, fruits of crime, or things otherwise criminal possessed; (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; (or person for whose arrest there is probable cause, or who is unlawfully restrained).

concerning a violation of Title 26 United States Code, Section (s) 7206(2), and
Title 18 United States Code, Section (s) 286 and 287

The facts to support a finding of probable cause are as follows:

## SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

_____
Signature of Affiant
Carlos Quirarte

Sworn to before me and subscribed in my presence,

April 10, 2009                                        at      Fresno, CA
Date                                                               City                                    State

SANDRA M. SNYDER, United States Magistrate Judge
Name of Judge                          Title of Judge          Signature of Judge

AO 106 (Rev. 12/03) Affidavit for Search Warrant  8/07

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)



**604 CHARLES STREET
ARVIN, CALIFORNIA**

**420 5ᵗʰ STREET
ARVIN, CALIFORNIA**



### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

Case Number:

1: 0 9 SW   0 0 0 9 1 SMS

## ORIGINAL
## FILED

APR 1 3 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                DEPUTY CLERK

I, _Carlos Quirarte_ being duly sworn depose and say:

I am a(n) Special Agent with the Internal Revenue Service, Criminal Investigations and have reason to believe that ☐ on the person of or ☒ on the property or premises know as (name, description and/or location)

### SEE ATTACHMENTS A

in the _____ EASTERN _____ District of _____ CALIFORNIA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

### SEE ATTACHMENT B

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

(1) property that constitutes evidence of the commission of a criminal offense; (2) contraband, fruits of crime, or things otherwise criminal possessed; (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; (or person for whose arrest there is probable cause, or who is unlawfully restrained).

concerning a violation of Title **26** United States Code, Section (s) **7206(2)**, and
Title **18** United States Code, Section (s) **286 and 287**

The facts to support a finding of probable cause are as follows:

## SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Signature of Affiant
Carlos Quirarte

Sworn to before me and subscribed in my presence,

April 10, 2009      at    Fresno, CA
Date

City          State

SANDRA M. SNYDER, United States Magistrate Judge
Name of Judge        Title of Judge      Signature of Judge

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Carlos Quirarte, a Special Agent with the United States Department of the Treasury, Internal Revenue Service (IRS), Criminal Investigation Division, being duly sworn depose and state as follows:

1. I am currently assigned to the Sacramento post-of-duty. I am a graduate of the Criminal Investigator Training Program and Special Agent Investigative Techniques at the Federal Law Enforcement Training Center in Glynco, Georgia, which included courses in the law of search and seizure under the Fourth Amendment. My duties as a Special Agent include the investigation of possible violations of Title 26, Title 31, and Title 18 of the United States Code. I have a Bachelor's of Science Degree in Business Administration with a concentration in Accounting from California State University, Sacramento. I have been an employee of the Internal Revenue Service, Criminal Investigation Division since June 2005, during which time I have conducted criminal investigations, analyzed various financial records and prepared reports. I have testified before a Federal Grand Jury concerning the above mentioned matters. I have been involved in the execution of various financial search warrants involving investigations concerning money laundering and income tax violations.

2. Prior to my employment with the Internal Revenue Service, I was an Investigative Auditor for the California Department of Justice, Bureau of Medi-Cal Fraud and Elder Abuse for over 2 ½ years, during which time I conducted criminal investigations concerning violations of the State of California Medi-Cal Program. I was also previously employed with the California State Board of Equalization for approximately nine years, during which time I held the titles of Sales Tax Auditor and Accounting Officer Specialist. As a Sales Tax Auditor, I conducted numerous audits of Sales and Use Tax Returns filed with the State Board of Equalization. As an Accounting Officer

1

Specialist, I reconciled State of California Funds, prepared quarterly and yearly financial statements, and reviewed and reconciled bank accounts to the State Controller's and the State Treasurer's records.

3.    I am presently the coordinator of the Questionable Refund Project (QRP) for the IRS, Criminal Investigation, in the Sacramento Post of Duty. The purpose of this project is to identify and investigate schemes involving multiple claims for fraudulent tax refunds. My involvement has required me to receive, review and analyze numerous information items, originating from the IRS Fraud Detection Centers and the tax preparation community, to determine potential fraudulent refund schemes.

4.    From my experience, I know that individuals engaged in financial crimes normally maintain records of their financial activities, such as receipts for expenditures by cash and check, bank records, and other financial documents within their residences, place of business, rented storage units, vehicles, and other places under their control.  These records may be in the form of written notes and correspondences, receipts, negotiated instruments, contracts, bank statements, tax returns and other records.  Records of this kind are also often stored on computer media.

5.    Persons engaged in tax evasion and fraud schemes often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience and review of United States v Greany, 929 F.2d 523 (9th Cir. 1991), the Ninth Circuit and other courts have held that, where there is an ongoing criminal business or where the evidence is of a nature that would be kept long after the criminal activity has ceased, the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale.

2

6.      There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, and may be unaware that such evidence may be retrievable by a trained forensic computer expert.

7.      It is from my experience in identifying and investigating QRP-type cases and other criminal tax matters, and from the shared experiences and advice of senior IRS-CI Special Agents, that I base my knowledge and assertions. I know that it is common for people operating a fraudulent refund scheme to submit false Form W-2s or false wage and income amounts. I know that it is common for these perpetrators to misuse Social Security numbers (SSNs), and/or to use false SSNs, SSNs that belong to children, misleading or false addresses, misleading or false identification documents and numbers, and misleading or false names. I know that it is common to find in false claims schemes similar handwriting or typewriting on the various fraudulent tax returns and other related documents. I know that fraudulent refund schemes are typically ongoing and that information is maintained by the perpetrators to be used on tax returns year after year. Finally, I know that it is

3

common for these perpetrators to keep within their residence or vehicles the information they utilize to make fraudulent claims.

8.     The United States Postal Service (USPS) offers P.O. boxes to customers who do not have free carrier delivery at their residence, and also to customers who prefer a P.O. Box for delivery of their mail. The USPS charges a P.O. Box fee only if the customer already has free carrier delivery at his or her residence. The USPS owns the P.O. boxes and maintains them for the customer's convenience. To apply for a P.O. Box, a customer must fill out a PS Form 1093 (Application for P.O. Box) and present two forms of current valid identification to the Post Office Clerk. If a person is married, his or her spouse must also complete the PS Form 1093, and anyone else who is allowed to pick up mail from that P.O. Box must also be listed on the PS Form 1093.

9.     PS Form 1093 reveals the owner of a P.O. Box and where the owner resides. PS Form 1093 also identifies the individuals allowed to receive mail at a particular P.O. Box address. From my experience, people who use P.O. Box addresses to carry out fraudulent refund schemes will continue to use P.O. Box addresses year after year. I know that it is common for individuals who commit criminal activities to use P.O. Boxes instead of their physical addresses to commit the crime to elude law enforcement. I also know that fraudulent refund schemes are typically ongoing, and individuals who are involved year after year are likely to retain documents at their residences, including for future use in the scheme.

4

## CRIMINAL VIOLATIONS

10. This affidavit is made in support of an application for search warrants regarding the locations described in the Attachments A annexed hereto and to search for and seize property as described in Attachment B which constitutes evidence of the commission of criminal offenses, the fruits of such crimes, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing criminal offenses that constitute violations of law under:

- Title 18, United States Code, Section 286 (Conspiracy to Defraud the United States with respect to Claims,

- Title 18, United States Code Section 287 (Filing False, Fictitious, or Fraudulent Claims with the United States Government); and

- Title 26, United States Code, Section 7206(2) (Aiding or Assisting in the Preparation of a False Income Tax Return)

## AREAS TO BE SEARCHED

11. The search warrant sought is primarily for the seizure of documentary evidence, including handwritten or typewritten records and documents, as well as computer generated records, any computer hardware and software, and other such items as more fully described in Attachment B, items to be seized, relating to the operation and illegal activities of the criminal violations disclosed above. The scope of the search warrant includes the below-named properties, as well as all outbuildings, storage bins and vehicles located on the curtilage of the target search locations as detailed in the Attachments A annexed hereto.

12. I make this affidavit in support of an application for issuance of search warrants for the following premises, as described more fully in the seven separate Attachments A annexed hereto:

5

A.

B.

C.

D.    604 Charles Street
      Arvin, CA 93203

E.    420 5th Street
      Arvin, CA 93203

F.

13.    These searches should include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, rooms, sheds and outbuildings associated with these premises and shall extend into desks, cabinets, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises, to include the search of any computer-based storage media contained within the premises and any other storage locations within the premises in which items in Attachment B may be found. Based on my experience, knowledge, and training, and that of other agents I have spoken with, suspects in similar investigations, possess storage safes, computers, facsimile machines, cell phones and pagers and use them as part of their method of operation. I have found or talked with agents who have found these types of items at such locations in past investigations.

6

14. I also request that the search include any and all vehicles which are found on the premises and/or the curtilage of the residences. Based on my experience, knowledge, and training, and that of other agents I have spoken with, suspects in this type of investigation transport items, and property, via their vehicles and store them inside of said vehicles. I have familiarity with past investigations in which documents have been found in automobiles. Other agents have told me that these vehicles are not necessarily registered to the person who has control over the vehicle.

15. I believe that probable cause exists that evidence, fruits, instrumentalities, documents, and other items more fully described in Attachment B annexed hereto and incorporated herein are located at the locations described above and in the Attachments A annexed hereto and that they will tend to establish violations of Title 18, United States Code, Sections 286 and 287 and Title 26, United States Code, Section 7206(2).

16. I request that the search warrants for these locations authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises.

17. The items to be seized are documents, records and instrumentalities relating to the submission of false claims, via the United States Mail, with the United States Government, specifically the Internal Revenue Service, for the purposes of obtaining fraudulent tax refunds.

## FACTS ESTABLISHING PROBABLE CAUSE

18. Based on my investigation, I have reason to believe that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ JOSE ANTONIO MORENO LOPEZ (JOSE ANTONIO MORENO), YSIDRO

MORENO LOPEZ (YSIDRO MORENO), ▮▮▮▮▮▮▮▮▮▮▮

7

have committed violations of Title 18, United States Code,

Sections 286 and 287, and Title 26, United States Code, Section 7206(2). There is probable cause to

believe that evidence of the violations mentioned above will be found on the premises listed above.

## OVERVIEW OF QRP SCHEMES IN THE CENTRAL VALLEY

19.     On or about September 2007, the IRS Fresno Fraud Detection Center (FDC)

identified fraudulent refund schemes referred to as QRP schemes in the Central Valley of California.

Simultaneously the U.S. Postal Inspection Service contacted our agency because they had

discovered several hundred refund checks going to just a few Post Office Boxes in Planada,

California, and other small cities located in the Central Valley of California. The checks discovered

by the U.S. Postal Inspection Service were later identified as being involved in the fraudulent refund

schemes identified by the Fresno FDC. Over 11,000 Federal Income Tax Returns, covering tax years

2003 through 2008, have now been identified as being part of these schemes. The Fresno FDC

analyst has associated these tax returns with each other through the identification of similar

characteristics, including the use of computers to prepare tax returns, submission of applications for

Individual Taxpayer Identification Numbers (ITIN) simultaneously with the tax returns, photocopied

Form W-2s, use of common mailing addresses, and use of common income/wage information. The

returns identify income amounts purportedly earned by the taxpayers, but the returns are actually

based on false Form W-2s, and then claim refunds based on taxes allegedly withheld from this

purported income. All of the tax returns have been verified as being false as to a material matter.

20.     The QRP schemes involve Federal individual income tax returns claiming fraudulent

wages and withholdings. These returns are typically filed using an ITIN instead of a Social Security

number, although in some cases the filers used SSNs from fraudulently obtained W-2s. An ITIN is

8

obtained by filling out a Form W-7, which is an Application to obtain an ITIN. Form W-7 is intended for use by individuals who are not U.S. citizens, nationals or permanent residents. An ITIN is for tax purposes only. Individuals cannot apply for an ITIN if they have obtained or are eligible to obtain an SSN. Receipt of an ITIN does not create an inference regarding the holder's immigration status or right to work in the United States. Receipt of an ITIN also does not make the recipient eligible to claim the Earned Income Credit (EIC).

21.     In most cases in the QRP schemes, the tax returns were submitted with no identification in the section where an individual would normally insert an SSN or ITIN. Tax returns submitted to the IRS without an ITIN or SSN were typically accompanied with a Form W-7 (Application for an ITIN). If the required identifications were submitted with the Form W-7, the IRS would issue an ITIN to the applicant, assign the ITIN to the tax returns submitted by that individual with the Form W-7, and begin processing the tax returns. Income tax returns submitted in this manner (with a Form W-7 attached) are treated by the IRS as income tax returns using ITINs even though the ITIN was not written in the identification portion of the return by the individual submitting the return. In some cases, the SSNs from fraudulently obtained Form W-2s were used. However, if the income tax return included an attached Form W-7, the IRS issued and used an ITIN as the identification number for the tax return instead of the SSN. In other cases where the individual had already obtained an ITIN, the ITIN was typed on the identification portion of the tax return.

22.     The majority of the false Form W-2s submitted with the filed tax returns in the QRP schemes used legitimate SSNs that did not belong to the individuals filing the tax returns. FDC caseworkers have confirmed through review of Social Security Administration records that the SSNs

9

on the false Form W-2s were not issued to the individuals whose names were listed on the false Form W-2s and on the tax returns with which the Form W-2s were filed. The returns filed in the fraudulent refund schemes used Forms 1040EZ or 1040A.

23.    The total amount of fraudulent refunds claimed on tax returns associated with these schemes to date exceeds seventeen million dollars ($17,000,000) and the Government has lost in excess of six million dollars ($6,000,000), due to the Service's inability to prevent these fraudulently claimed refunds from being issued prior to being identified as fraudulent.

24.    These QRP schemes originated in 2004 in several towns and small cities located in the Central Valley of California. Since that time, the schemes have expanded to Northern, Central and Southern California as well as twelve other states. The QRP schemes began with the filing of approximately one hundred (100) returns during the years 2004 through 2006. During the year 2007 the schemes grew to over 2,500 returns filed and during the year 2008 grew exponentially, with over 10,000 fraudulent returns filed with IRS.

25.    The fraudulent Federal individual income tax returns involved in the QRP schemes frequently exhibit similar characteristics. For example, there are common addresses, wages, withholdings, and/or employers. Additionally, as discussed above, ITINs are typically used instead of SSNs, and filers frequently simultaneously apply for ITINs and file multiple year tax returns.

26.    Wage verifications have been done with over 350 different employers used in the QRP schemes. These employers verified with the FDC caseworkers that both the W-2s that were purported to have been issued by the employers, and the wages reported on the W-2s, were false.

27.    The addresses used in the QRP schemes include both physical addresses and P.O. Box addresses. Approximately 150 P.O. Boxes and over 500 physical addresses have been used in the

10

schemes to date. The six (6) addresses set forth in the annexed Attachments A have between 30 and 134 fraudulent tax returns filed listing those addresses as the mailing address on the return.

28.    I·have obtained numerous photocopies of negotiated Federal Income Tax refund checks issued by the U.S. Treasury Department related to the QRP schemes. All of these refund checks were issued based on returns filed utilizing false Form W-2s. These returns claimed refunds based on allegedly-withheld taxes. Computer analysis reveals that these checks represent over $6,000,000 that the U.S. Government has lost to fraudulent claims.

·  29.    Refund checks have been cashed at various locations throughout the Central Valley of California.  A few examples of the locations that have been used frequently to cash the checks are:

30.    Many of these refund checks involved in the schemes have the name of the payee written in the endorsement area of the check, along with a driver's license number. The driver's license number written in the endorsement area typically does not match the payee. California Department of Motor Vehicles (DMV) records reveal that the driver's license numbers used on these checks are not assigned to the names with whom they are associated on the refund checks. I know from experience that one aspect of perpetrating fraudulent QRP schemes is converting the refund checks into currency or tangible funds. I know that perpetrators of these schemes use various methods of negotiating the refund checks, ranging in levels of sophistication, including cashing the checks at check-cashing businesses and using false identity documents. An analysis of a sampling of refund checks issued as a result,of the false claims filed for the years 2003 through 2008 revealed

11

that some of the checks bear what appears to be the endorsement of the payee, along with a second endorsement.

31.     As of February 20, 2009, the QRP schemes have grown to over 11,000 income tax returns filed claiming fraudulent refunds.

## SUMMARY OF INVESTIGATION TO DATE

32.     To date, investigative results indicate that the following individuals are participants in a conspiracy to defraud the Government by submitting false income tax returns to the IRS to claim Federal income tax refunds to which they are not entitled.



12







15









**Jose Antonio Moreno Lopez – 604 Charles Street, Arvin, CA**

55.     Through database queries, drive-bys, surveillance and controlled mail delivery
results from June 11, 2008 to March 21, 2009, it was determined that JOSE ANTONIO
MORENO (SSN: 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) resides at **604 Charles Street, Arvin, California ("604 Charles
Street")**. Postal records reveal that JOSE ANTONIO MORENO receives mail at **604 Charles
Street.** A search of county records revealed that JOSE ANTONIO MORENO owns the
residence at **604 Charles Street.**

56.     I have obtained from the Fresno FDC photocopies of IRS tax refund checks
generated as a result of fraudulent tax returns filed with the IRS. The analysis of a sample of
these checks has revealed that the initial signature appears to be the name of the individual to
whom the check was issued. Sixteen (16) of the checks, issued from October 19, 2007 to
October 26, 2007 were co-endorsed by JOSE ANTONIO MORENO and cashed at J & M Market

19

in Arvin, California. The sixteen (16) cashed refund checks also contained CDL number

C7145634 on the endorsement section.

57.   I obtained a copy of CDL number C7145634, and it was issued in the name of

"Jose Antonio Moreno." A comparison was made of the signature on JOSE ANTONIO

MORENO's CDL and the signature on the tax refund checks, and it is my opinion that the

signatures appear similar.

58.   As of February 20, 2009, an analysis of the returns in the scheme revealed 89 of

the fraudulent tax refunds listed the address **604 Charles Street**, the residence of JOSE

ANTONIO MORENO, as the return address. These fraudulent returns claimed a total of

$168,863 in refunds. In the year 2007, the address **604 Charles Street** was used approximately

22 times from September 26, 2007 to November 3, 2007, on income tax returns with fraudulent

refunds. In the year 2008, the address **604 Charles Street** was used approximately 67 times

from January 14, 2008 to September 20, 2008 on income tax returns with fraudulent refunds.

59.   On June 11, 2008, a PS Form 3849 notice was delivered to **604 Charles Street**,

Arvin, California notifying the individual residing at **604 Charles Street** that an IRS

correspondence addressed to **604 Charles Street** was at the Arvin Post Office waiting to be

picked up. The IRS correspondence was caused by a fraudulent tax return filed listing

**604 Charles Street** as the return address. At approximately 3:53pm on June 11, 2008, an adult

male individual, later identified as JOSE ANTONIO MORENO from DMV records, walked into

the Arvin Post Office and presented the PS Form 3849 notice to a postal employee and provided

a CDL with the number C7145634. JOSE ANTONIO MORENO printed and signed his name

"Antonio Moreno" on the PS Form 3849 before the postal employee handed the IRS

correspondence to him. JOSE ANTONIO MORENO exited the Arvin Post Office and got into a
blue Nissan pick-up with California license plate number 5S68362. JOSE ANTONIO
MORENO drove to **420 5th Avenue** in Arvin, California. Parked in front of **420 5th Avenue** was
a Lincoln Navigator with California license plate number 4YMX238. The registered owners for
the Lincoln Navigator are Maria and YSIDRO MORENO living at **420 5th Avenue**. As set forth
below, the address **420 5th Avenue** and YSIDRO MORENO are also involved in this fraudulent
refund scheme.

60.     On June 13, 2008, three PS Form 3849 notices were delivered to **604 Charles
Street** notifying the individuals residing at **604 Charles Street** that IRS correspondences
addressed to **604 Charles Street** were at the Arvin Post Office waiting to be picked up. The IRS
correspondences were caused by fraudulent returns filed listing address **604 Charles Street** as
the return address. On June 16, 2008, an adult male individual, later identified as JOSE
ANTONIO MORENO from DMV records, walked into the Arvin Post Office, presented the
three PS Form 3849 notices to a postal employee, and provided a CDL with the number
C7145634. JOSE ANTONIO MORENO signed the name "Antonio Moreno" on the three PS
Form 3849 notices before the postal employee handed the IRS correspondence to him.

61.     On June 19, 2008, four PS Form 3849 notices were delivered to **604 Charles
Street** notifying the individuals residing at **604 Charles Street** that IRS correspondences
addressed to **604 Charles Street** were at the Arvin Post Office waiting to be picked up. The IRS
correspondences were caused by fraudulent tax returns filed listing **604 Charles Street** as the
return address. On June 23, 2008, a female individual, who identified herself as the daughter of
JOSE ANTONIO MORENO, walked into the Arvin Post Office, presented the four PS Form

21

3849 notices to a postal employee, and provided JOSE ANTONIO MORENO's CDL with the number C7145634. The female printed and signed her name "Maricruz Moreno" on the four PS Form 3849 notices before the postal employee handed the IRS correspondences to her.

62. On June 23, 2008, three PS Form 3849 notices were delivered to **604 Charles Street**, notifying the individuals residing at **604 Charles Street** that IRS correspondences addressed to **604 Charles Street** were at the Arvin Post Office waiting to be picked up. The IRS correspondences were caused by fraudulent tax returns filed listing **604 Charles Street** as the return address. On June 25, 2008, an adult male individual, later identified as JOSE ANTONIO MORENO from DMV records, walked into the Arvin Post Office, presented the three PS Form 3849 notices to a postal employee, and provided a CDL with the number C7145634. JOSE ANTONIO MORENO signed the name "Antonio Moreno" on the three PS Form 3849 notices before the postal employee handed the IRS correspondence to him.

63. On January 29, 2009, during a drive-by of **604 Charles Street**, IRS Special Agents observed two vehicles parked in the drive way: a blue Chevy pick-up with California license plate number 7D92580 and a blue Nissan pick-up with California license plate number 5S68362. DMV records revealed the blue Chevy pick-up and the blue Nissan pick-up are registered to JOSE ANTONIO MORENO at **604 Charles Street**. The blue Nissan pick-up is the same vehicle JOSE ANTONIO MORENO was driving on June 11, 2008, the day he was seen walking into the Arvin Post Office with a PS Form 3849 notice and picking up IRS correspondence.

64. On March 21, 2009 at approximately 10:15 am, Postal Inspector Ted Mort accompanied a letter carrier employed by USPS to **604 Charles Street**, and observed the letter

22

carrier knock on the residence door and hand the male occupant of the residence a U.S. Treasury check and IRS correspondences addressed to **604 Charles Street**. The U.S. Treasury check and the IRS correspondences were caused by fraudulent tax returns filed listing **604 Charles Street** as the return address.

65.     Information received from the Social Security Administration reveals that JOSE ANTONIO MORENO was born in Guanajuato, Mexico, received an SSN in 1988, and was reissued a new Social Security card with the same SSN in 1991 because he claimed to have misplaced his original Social Security card. I have also spoken with ICE agents who have informed me that ICE has no record of JOSE ANTONIO MORENO presently being in the United States legally.

## Ysidro Moreno Lopez – 420 5th Street, Arvin, CA

66.     Through property checks, DMV checks, surveillance, and controlled mail delivery results from June 10, 2008 to March 21, 2009, it was determined that YSIDRO MORENO (XXX-XX-8922) and his spouse Maria Moreno reside at **420 5th Street, Arvin, California 93203 ("420 5th Street")**. Postal records reveal that YSIDRO MORENO receives mail at **420 5th Street**. A search of county records revealed that YSIDRO MORENO and his spouse Maria Moreno own the residence at **420 5th Street**.

67.     I have obtained from the Fresno FDC photocopies of IRS tax refund checks generated as a result of fraudulent tax returns filed with the IRS. The analysis of a sample of these checks has revealed that the initial signature appears to be the name of the individual to whom the check was issued. Two of the checks, issued on October 19, 2007 and October 26,

23

2007, were co-endorsed by YSIDRO MORENO and cashed at J.& M Market in Arvin, California. The two cashed refund checks also contained CDL number C4527176 on the endorsement section.

68.    I obtained a copy of CDL number C4527176, and it was issued in the name of "Ysidro Moreno Lopez." A comparison was made of the signature on YSIDRO MORENO LOPEZ's CDL and the signature on the two tax refund checks discussed in the previous paragraph, and it is my opinion that the signatures appear similar.

69.    An analysis of the scheme revealed 78 fraudulent tax returns listed **420 5th Street** as the return address. These fraudulent returns claimed a total of $150,203 in refunds. In the year 2007, the **420 5th Street** address was used approximately 17 times, from September 25, 2007 to November 4, 2007, on income tax returns with fraudulent refunds. In the year 2008, the **420 5th Street** address was used approximately 61 times, from January 14, 2008 to September 7, 2008, on income tax returns with fraudulent refunds.

70.    On June 10, 2008, a PS Form 3849 notice was delivered to **420 5th Street**, notifying the individual residing at **420 5th Street** that an IRS correspondence addressed to **420 5th Street** was at the Arvin Post Office waiting to be picked up. The IRS correspondence was caused by a fraudulent tax return filed listing **420 5th Street** as the return address. At approximately 2:30pm on June 10, 2008, an individual, later identified as YSIDRO MORENO through DMV records, walked into the Arvin Post Office and presented the PS Form 3849 notice to a postal employee. YSIDRO MORENO provided a CDL with the number C4527176. YSIDRO MORENO printed and signed the name "Ysidro Moreno" on the PS Form 3849 before the postal employee handed the IRS correspondence to him. YSIDRO MORENO then exited the

24

Arvin Post Office and got into a white Ford F-150 with California license plate number 8P51402. According to DMV records, YSIDRO MORENO, residing at **420 5th Street**, is the registered owner of the white Ford F-150. YSIDRO MORENO drove to his residence at **420 5th Street** and went inside the residence. Parked outside the residence at **420 5th Street** was a silver Lincoln Navigator with California license plate number 4YMX238. The silver Lincoln Navigator came back being registered to YSIDRO MORENO living at **420 5th Street**.

72. On June 18, 2008, a PS Form 3849 notice was delivered to **420 5th Street**, notifying the individual residing at **420 5th Street** that an IRS correspondence addressed to **420 5th Street** was at the Arvin Post Office waiting to be picked up. The IRS correspondence was caused by a fraudulent tax return filed listing **420 5th Street** as the return address. On June 20, 2008, an adult male individual, later identified as YSIDRO MORENO from DMV records, walked into the Arvin Post Office, presented the PS Form 3849 notice to a postal employee, and provided a CDL with the number C4527176. YSIDRO MORENO signed the name "Ysidro Moreno" on the PS Form 3849 notice before the postal employee handed the IRS correspondence to him.

72. On January 29, 2009, during a drive-by of **420 5th Street**, IRS Special Agents observed a white Ford F-150 parked in the drive way with California license plate number 8P51402. DMV records revealed the white Ford F-150 is registered to YSIDRO MORENO at **420 5th Street**. On March 21, 2009 at approximately 8:30am, Postal Inspector Ted Mort accompanied a letter carrier employed by USPS to **420 5th Street**, and observed the Letter Carrier knock on the residence door and hand a female occupant of the residence IRS correspondences

25

addressed to **420 5ᵗʰ Street**. The IRS correspondences were caused by fraudulent tax returns

filed listing **420 5ᵗʰ Street** as the return address.

73.    I have reviewed ICE records which reveal that YSIDRO MORENO is a Legal

Permanent Resident in the United States.  ICE records also reveal that YSIDRO MORENO was born

in Yuriria, Guanajuato, Mexico.



26









## EVIDENCE OF CONSPIRACY

84.    Based on my investigation, I believe ████████████████████████████
███████████████ JOSE ANTONIO MORENO, YSIDRO MORENO, ████████
██████████████████████████ are participating in a conspiracy to defraud the

Government by submitting false income tax returns to the IRS and thereby claiming federal

income tax refunds to which they are not entitled.  The fraudulent returns filed using the

addresses and P.O. Boxes of the above-listed individuals share many of the same characteristics.

### A.    Characteristics Common to the Fraudulent Returns

85.    The following is a list of some of the similarities of the returns filed using

addresses associated with the above-listed individuals:

30

- The returns use common employers and common wage amounts on W-2s submitted with the returns (discussed separately below);

- Almost all the returns use ITINs rather than SSNs (As previously mentioned above, with respect to a tax return submitted with a blank identification section and Form W-7 attached to it, an ITIN is assigned to it by the IRS and the return is treated as a tax return using an ITIN instead of an SSN);

- All the returns are paper filed Form 1040EZ or 1040A returns;

- Almost all of the returns list a filing status of single;

- Almost all of the returns list the taxpayer's occupation as labor-work;

- All the returns are computer-generated paper returns;

- Returns for multiple years (for example, 2004, 2005, and 2006) were filed together at one time, thereby generating fraudulent refunds for three years from a single mailing;

- The returns were filed simultaneously with Forms W-7 (ITIN Application);

- All ITIN applications use Mexican Identifications to support the request;

- Most of the returns used photocopied W-2s with legitimate SSNs not issued to the individual whose name appears on the W-2;

- The fraudulent Form W-2s list farm labor contractors as employers;

- The fraudulent Form W-2s have similar and/or identical wage amounts; and

31

• Most of the refund checks issued to the addresses of the above-listed individuals
were cashed at two primary locations: ███████████████████████████████

███████████████████████████

**B.    Common Employers Used on W-2s Submitted With Fraudulent Returns**

86.     The employers and employer tax identification numbers listed on the false Form

W-2s submitted with the fraudulent returns in this scheme include common employers from

which ███████████████████████████████████████     JOSE ANTONIO

MORENO, YSIDRO MORENO, and ████████████     had reported wage earnings to the

IRS in the past.

87.     All the employers used on the Form W-2s submitted with the fraudulent returns in

this scheme are from California.  The Form W-2s at times vary the spelling of the company name

or alter the company address slightly.  Most of the Form W-2s used in the scheme are

photocopied W-2s.

88.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

89.     "HRM Farm Labor Services" was used on false Form W-2s submitted with

fraudulent returns associated with at least 6 of the 7 individuals listed above.  The following is a

summary, broken down by the addresses listed on the tax return, of the approximate number of

fraudulent returns filed using "HRM Farm Labor Services" as the employer listed on the false

Form W-2s enclosed with the returns:

• ███████████████████████████████████████████

32



- JOSE ANTONIO MORENO's residence at **604 Charles Street** – 3 times



90. 

91.    "Adolfo Perez Farm Service" was listed as the employer on false Form W-2s

submitted with approximately 258 fraudulent returns filed in QRP schemes in the Central Valley,

including fraudulent returns submitted with the following mailing addresses:



- **604 Charles Street**, JOSE ANTONIO MORENO's residence – 1 time

- **420 5th Street**, YSIDRO MORENO's residence – 14 times



92.

33



95.    "Jose Ramos Labor Contracting" was listed as the employer on false Form W-2s

submitted with approximately 64 fraudulent returns filed in QRP schemes in the Central Valley,

including fraudulent returns filed with the following mailing addresses:

- **604 Charles Street**, JOSE ANTONIO MORENO's residence – 8 times

- **420 5th Street**, YSIDRO MORENO's residence – 9 times

96.    The following is a list of employers used most frequently on false Form W-2s

submitted with fraudulent returns in the scheme:



97.     The false Form W-2s used in the scheme also used similar or identical wage

amount. The following is a list of wage amounts used most frequently on W-2s submitted with

tax returns filed listing addresses linked to one of the co-conspirators, and the number of times

the wage amounts were used:

| Wage Amount | # of Times Used | Addresses on Returns | Co-conspirator | Employers Used |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| $15,296 | 25 | 604 Charles Street<br><br>420 5th Street | Jose Antonio Moreno<br><br>Ysidro Moreno | Torres Farm Labor Contractor; Pro and Family, Inc.; 7th Standard Ranch Co.; Jose Ramos Labor Contracting; Adolfo Perez Farm Labor Service; JL Padilla & Sons Labor Service; Sunview Vineyards of California, Inc.; and Esparza Enterprises, Inc. |

98.     All of the above-listed employers used on the false Form W-2s were contacted and the employers verified that the Form W-2s were false.   The employers confirmed that they never employed the individuals whose names were listed on the false Form W-2s.

36

### C.   Additional Evidence of Conspiracy

99. 

100.

101.  I have reviewed immigration records which have revealed that ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ YSIDRO MORENO, and ▆▆▆▆▆▆▆▆ are Legal Permanent Residents in the United States. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Information from the Social Security Administration revealed JOSE ANTONIO MORENO was born in Guanajuato, Mexico.

102.   During a surveillance conducted on June 11, 2008, IRS Special Agents observed JOSE ANTONIO MORENO drive to **420 5ᵗʰ Avenue**.  Parked in front of **420 5ᵗʰ Avenue** was YSIDRO MORENO's Lincoln Navigator.

103. Based upon my analysis of facts developed in this investigation, as described above, I believe that this is an ongoing scheme to defraud the United States Government and that information such as names, Social Security numbers, and wage information is maintained by the perpetrators to be used year after year. I believe that the evidence to be seized, further described in Attachment B, will show the preparation and submission of false income tax returns, the creation of false W-2s, identification documents, the receipt of refunds, and the disposition of these refunds. This evidence is of an ongoing criminal business and the evidence is of the nature that would be kept long after the criminal activity ceased. In my experience, I have learned that there are many reasons why tax law violators and fraud perpetrators maintain evidence for extended periods of time. For instance, the evidence may appear innocuous at first glance (e.g. financial, credit card, and banking documents; personal calendars, telephone and address directories; checkbooks; letters and notes; keys to safe deposit boxes; computer hardware and software; tax returns and other financial records), but have significance and relevance only when considered in light of other evidence.

## EXPLANATION OF ATTACHMENTS

104. Attachments A are physical descriptions of the locations to be searched.

105. Attachment B is description of the items to be seized at the locations being searched.

106. Based on my training and experience, it is my belief that the vehicles discussed above were used to travel to various Post Offices in order to retrieve mail. These vehicles were observed by IRS-CI Special Agents, United States Postal Inspectors and Post Office employees

38

being driven to the Post Offices. The retrieved mail included U.S. Treasury tax refund checks that the co-conspirators were not entitled to receive. Further, it is my belief, based on my training and experience, that individuals engaged in this type of fraud will possess various papers relating to fraud, such as Form W-2s, copies of Form W-2s, tax returns, Form W-7s, and ITINs in various places, including vehicles.

## SEARCH OF COMPUTER RELATED ITEMS

### Background and Definitions Regarding Computer Searches

107.    The fraudulent income tax returns involved in these schemes are all computer generated. The criminal offender may be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, and may not be aware that such evidence may be retrievable by a trained forensic computer examiner. This data that the user believes is deleted may remain on the electronic storage media for years, and it could be recoverable by a trained computer forensics examiner.

108.    During the course of my investigation, I have consulted with IRS Computer Investigative Specialist (CIS) Special Agent Scott Friesen regarding the aspects of properly retrieving and analyzing electronically stored computer data. CIS Special Agent Friesen has been employed with IRS-CI for 13 years. In addition to attending training in financial investigation techniques and accounting, he has attended the IRS-CI Pre-Computer Evidence Recovery Training (Pre-CERT) and Basic Computer Evidence Recovery Training (BCERT) courses at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training and field experience CIS Special Agent Friesen has learned about the operation of computer systems and

39

the correct procedures for seizure and analysis of computer systems and related digital media. As of March of 2009, CIS Special Agent Friesen has participated in approximately 20 search warrants and consent searches during which he has participated in the seizure and/or imaging of over 50 computers. CIS Special Agent Friesen has been responsible for analyzing seized electronic data and records from over 50 computers including those seized pursuant to the search warrants/consent searches, as well as computers seized by other agencies and transferred to him to be analyzed.

109.    Based on his knowledge, CIS Special Agent Friesen has advised me that to properly retrieve and analyze all electronic stored (computer) data, to document and authenticate such data, and to prevent the loss of data either from accidental or deliberate programmed destruction requires on-site and laboratory analysis by a qualified computer specialist. To effect such accuracy and completeness may require the seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords and decryption keys), and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is because the peripheral devices which allow users to enter or retrieve data from storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It may be important that the computer system be re-configurable to accurately retrieve the evidence.

110.    Based upon my training, experience, and information stated by other Special Agents and others involved in the forensic examination of computers, I know that computer data

40

can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, thumb drives, and memory chips. I also know that during the search of the premises, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

(a) Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

(b) Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled, environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

(c) The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space

41

is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage

space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

Storage devices capable of storing fifteen gigabytes of data are now commonplace in

desktop computers. Consequently, each non-networked, desktop computer found

during a search can easily contain the equivalent of 7.5 million pages of data, which,

if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

(d) Computer systems can attempt to conceal data within computer equipment and

storage devices through a number of methods, including the use of innocuous or

misleading filenames and extensions. For example, files with the extension ".jpg"

often are image files; however, a user can easily change the extension to ".txt" to

conceal the image and make it appear that the file contains text. Computer users can

also attempt to conceal data by using encryption, which means that a password or

device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable

form. In addition, computer users can conceal data within another seemingly

unrelated and innocuous file in a process called "steganography." For example, by

using steganography, a computer user can conceal text in an image file, which cannot

be viewed when the image file is opened. Therefore, a substantial amount of time is

necessary to extract and sort through data that is concealed or encrypted to determine

whether it is evidence, contraband, or instrumentalities of a crime.

(e) As set forth above, the imaging and preservation of evidence within a computer and

software in the controlled environment of a laboratory is a complicated process that may

often take weeks, or months, to complete. In order to fully retrieve data from a computer

42

system, the examiner needs all electronic storage devices as well as the central processing unit (CPU). The search of a computer or electronic device may involve many different steps in analysis. Files can be difficult to recover and preserve. Databases and related files may require extensive search time to recover evidence. Sometimes vendors for specific software programs need to be contacted to provide assistance for the recovery of files. As in this case where the evidence may consist partly of printed documents, the monitor and printer are also sometimes necessary to show the nature and quality of the graphic images, which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software, which may have been used to create the data (whether stored on hard drives or on external media).

(f) The term "computer", as used herein, is defined pursuant to Title 18, United States Code, § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

(g) Computer hardware consists of all equipment, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.

(h) Hardware includes (but is not limited to) any data processing devices (such as central processing units, self-contained "laptop" or "notebook" computers, hand-held electronic organizers, and "personal digital assistants"; internal and peripheral storage devices (such

43

as fixed disks, external hard disks, tape drives, and other memory storage devices), and related communications devices such as modems, cables and connectors, programmable telephone dialing or signaling devices, and electronic tone generating devices, as well as any device, mechanism or part that can be used to restrict access to computer hardware such as physical keys, dongles and locks.

(i) As part of his search of the computer system and peripherals, the computer specialist searching the computer may need to make a mirror image copy of the hard drives, backup media, floppy diskettes, disk carriage, CD-ROMS, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks on which data was stored. A mirror image copy is an exact copy of the storage media. This is necessary to accurately reproduce the documents on the storage devices and to preserve the integrity of the data. The evidence will then be accessed using the mirror image copy.

(j) Permission is requested for the computer specialist to make a mirror image copy of the above storage media and conduct a search of the computer systems, hardware, software and backup media for the specific items described in this Affidavit and Attachment B. The image(s) may be utilized during the balance of the investigation to recover items described in this affidavit and Attachment B. The image of the storage media may be restored so that agents familiar with the case may search for evidence described in this Affidavit and Attachment B.

111.    In addition to the computer files and other data, it is also important to obtain a Computer Hardware Systems Date and Time, Operating System and Users' information maintained in the system. This is to provide sufficient documentation, authentication or

44

substantiation of the seized item(s). The User Information may include passwords, searches,

websites visited and other items that relate to the referenced violations. It is also a standard

practice for properly searching electronic/digital data to image the entire physical storage

medium, including any formatted file systems and storage area of the media. The file system is

the storage media's area recognized by and used by the operating system for storing and saving

data. By obtaining an image of the entire storage media, it can be properly searched for the items

called for to be seized that may remain as deleted files or the data that remains in the unallocated

section of the partitions, that is an area currently not assigned to a particular file but still is part of

the file system. In addition security devices may be being utilized. These are designed to restrict

access to or hide computer hardware, software, or data. Therefore the seizure of passwords, pass

phrases or other items used to access the computer system, operating system and data is

necessary. Without such it could be impossible to access for searching the system and/or data

protected with such. This would be analogous to a combination or key being required to open a

safe or lock.

### Searching or Seizing Electronic Devices or Media

112.    In executing this warrant, the government will begin by ascertaining whether all or

part of the search of computers or other electronic equipment or media that is authorized in this

warrant can be reliably completed at the site within a reasonable time. If the search can be so

completed on site, the government will remove a computer or other piece of electronic equipment

from the site only if necessary to preserve evidence or if the removed item is contraband or is a

forfeitable instrumentality or fruit of the crime.

45

113.    If the government determines that a reliable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government will proceed to determine whether all or part of the authorized search can be completed by making mirror images of, or in some other manner duplicating, the contents of any computer or other electronic device, then completing the search of those contents off-site, e.g., at a law enforcement lab.

114.    The government may remove a computer or other electronic device to reliably and efficiently complete an off-site search. The government may also remove from the search location a computer or other electronic device if it determines that the item cannot within a reasonable period be searched reliably on site or by mirror-imaging or by otherwise duplicating its contents for off-site examination. The government may also remove such an item if necessary to preserve evidence or if the item is contraband or is a forfeitable instrumentality or fruit of the crime.

115.    In conducting the search authorized by this warrant, whether on site or off site, the government will make all reasonable efforts to use methods and procedures that will locate and examine only those categories of files, documents or other electronically stored information that are identified in the warrant. The government may restore the image of original media and utilize the assistance of agents familiar with the case when searching for electronically stored information.

116.    Within the limitations described above and as part of the seizure of the aforementioned items, the searching agents may remove from the premises to be searched all computer hardware and related equipment, devices, disks, tapes, and other items, and all manuals

46

or written information relating to the operation of the computer hardware, software, and related equipment as follows:

a). Computer hardware and computer related equipment;

b). Computer software and all other electronic, magnetic or other media capable of being read or interpreted by a computer or its related components, and all information contained therein;

c). Electronically-stored communications;

d). Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation or data;

e). Physical keys, encryption devices and similar physical items that are necessary to gain access to computer programs, data or other information or otherwise to render programs, data or other information into a readable or usable form;

f). Electronic devices such as Personal Digital Assistants (PDAs) or electronic organizers;

g). Routers, bridges, hubs or routers and all manuals associated with such equipment; and

h). Computer related documentation consisting of written, recorded, printed or electronically stored material, which explain or illustrate how to configure or use computer hardware, software, or other related items.

## CONLCUSION

117. Based on the foregoing facts there is probable cause to believe that property designed or intended for use, or that is or has been used as the means of committing criminal offenses which are violations of Title 18, United States Code, Sections 287 and 286, and Title

47

26, United States Code, Section 7206(2), is located at the following locations, which are more fully described in the Attachments A annexed hereto:



A.

B.

C.

D.   604 Charles Street, Arvin, CA 93203

E.   420 5th Street, Arvin, CA 93203

F.

118.   Based on the foregoing, I have probable cause to believe that items constituting evidence, fruits, instrumentalities, and proceeds of illegal activity, more fully described in Attachment B, are currently maintained in the residences of JOSE ANTONIO MORENO, YSIDRO MORENO, listed above. These individuals are involved in an ongoing scheme to defraud the United States.

## SEARCH WARRANT REQUEST

119.   Wherefore, I respectfully request that a search warrant be issued allowing Special Agents of the United States Department of Treasury, Internal Revenue Service, with appropriate assistance from other Federal, State, and other local law enforcement agencies, to enter the locations as described in this affidavit and in the Attachments A annexed hereto, and therein search for and seize that which constitutes evidence of the commission of an offense, contraband,

48

the fruits of crime, and things otherwise criminally possessed and property designed or intended for use, or which is or has been used as the means of committing a criminal offense, as described in Attachment B of this affidavit.

120.    Based on the foregoing information provided in this affidavit, I believe that there is probable cause to search for the requested items at the above-described locations and to seize such items.

## SEALING REQUEST

121.    The criminal investigation regarding ████████████████████████

████████████████ JOSE ANTONIO MORENO, YSIDRO MORENO, ████████

████████████████████████ is ongoing. Further investigation may include additional interviews, subpoenas, and possibly grand jury testimony and search warrants. Disclosure of the contents of this affidavit at this time could seriously impede the continuing investigation and potential prosecution. Disclosing the details of the Government's investigation could potentially cause target (s) / subject (s) of the investigation to flee, destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case. Accordingly, the Court is

49

respectfully requested to issue an order sealing this search warrant application and affidavit until

further order of this Court.

CARLOS QUIRARTE
Special Agent
Internal Revenue Service
United States Department of Treasury

Subscribed and sworn before me this __10th__ day of April 2009 at Fresno, California.

UNITED STATES MAGISTRATE JUDGE
Eastern District of California

50

## ATTACHMENT A - 604 CHARLES STREET, ARVIN, CALIFORNIA.

### DESCRIPTION OF PROPERTY TO BE SEARCHED

**604 Charles Street, Arvin, California** is a residence located in Arvin, California. The residence is a one-story, single-family home, and is beige in color with off-white & brown trim. The front entrance has a black security door installed. There is an off-white, two-car garage on the left side of the residence as seen from Charles Street. The address 604 is painted on the curb at the center of the property as viewed from Charles Street. The address 604 is also in black numbers with a white background on the right side over the garage door facing Charles Street.

The search of this location shall include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, rooms, sheds and outbuildings associated with these premises, and shall extend into desks, cabinets, safes, briefcases, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. The search shall also authorize officers to search the persons and items attached to them (such as purses, backpacks, etc.) encountered at the various search locations, whether they are located indoors, outdoors or in an automobile found within the location and/or the curtilage of the location.

The search shall also include any and all vehicles at this location and/or within the curtilage of this location.

## ATTACHMENT A - 420 5th STREET, ARVIN, CALIFORNIA

### DESCRIPTION OF PROPERTY TO BE SEARCHED

**420 5th Street, Arvin California** is a residence located in Arvin, California. The residence is a one-story, single-family home, and is beige in color with brown trim, a brown roof, and a white front door with a glass oval-shaped insert in the center. The driveway is to the left side of the property as viewed from 5th Street. There is a building that appears to be an additional living or storage area to the left/rear of the main house as viewed from 5th Street. There is an unattached canopy over the driveway. The front of the property has a black wrought-iron fence. The address 420 is painted on the curb near the driveway as viewed from 5th Street. The address 420 is also in gold numbers on the trim over the front door facing 5th Street.

The search of this location shall include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, rooms, sheds and outbuildings associated with these premises, and shall extend into desks, cabinets, safes, briefcases, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. The search shall also authorize officers to search the persons and items attached to them (such as purses, backpacks, etc.) encountered at the various search locations, whether they are located indoors, outdoors or in an automobile found within the location and/or the curtilage of the location.

The search shall also include any and all vehicles at this location and/or within the curtilage of this location.



## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED

The items to be searched and seized from the locations described in Attachment A, and from persons and their property found therein, which constitute evidence of the commission of the offenses described below, contraband, the fruits of crime, and things otherwise criminally possessed, and property designed or intended for use, or which is or has been used as the means of committing a criminal offense, for violations of Title 18, §§ 286 and 287 and 26 U.S.C. §7206(2) for the time period from January 1, 2004 to the present, in whatever form, including handmade or mechanical form (such as printed, written, handwritten or typed), photocopies or other photographic form, and electrical, electronic and magnetic form (such as tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, ZIP cartridges, printer buffers, smart cards or electronic notebooks or any other storage medium), are more particularly described as:

1. Originals and copies of all Federal and State Income Tax Returns and related documents, including but not limited to blank, completed, or partially completed Forms 1040, Forms 1040A, Forms 1040EZ, Forms W-2, and Forms W-7. Related documents include tax preparation documents, worksheets, and instruction booklets; income tax return schedules and attachments; and any IRS correspondence.

2. United States Government and State of California refund checks, and any evidence of receipt and/or disposition of such refund checks.

3. Identification documents, including driver's licenses, passports, identification cards, social security cards, immigration and naturalization documents and cards, Alien Registration Receipt cards, foreign voter registration cards, foreign military identification cards, national identification cards, birth certificates, and any other documents used for identification purposes.

4. Financial records, receipts, documents reflecting purchases of assets, travel documents, calendars, telephone and address directories, and ownership records. Letters, notes, lists, documents, and mail, to the extent that they contain information regarding the filing of tax returns or claims for refund,

5. All bank records and instruments, consisting of statements, transcripts of accounts, correspondence, letters, memoranda, deposit slips, withdrawal slips, checks, checkbooks, check registers, financial statements, ATM cards and ATM receipts, credit card receipts and statements, records of cash transactions, money orders, cashier's checks and other types of guaranteed payment, wires and any negotiable instruments.

6. Any altered, forged, or otherwise false identification documents and any laminating machines, duplicating machines, and other tools or implements used in the manufacturing of identity documents, including documents or notes bearing handwriting samples.

7. Articles of personal property tending to establish the identity of a person in control of the premises, including utility company receipts, rent or mortgage documents, and addressed envelopes.

8. Computer hardware and software, thumb or zip drives, floppy discs, CDs, DVDs, external hard-drives, servers, cell phones, as well as any other digital media storage devices. All passwords, test keys, encryption codes or similar codes that are necessary to access computer programs, data or other information, storage devices or to otherwise render programs into useable forms. These records

1

include media maintained as archive or backup copies.

9.  Any and all post office box keys, applications, and receipts relating to the rental of post office boxes.

10. Any and all safe deposit box keys.

11. All currency in excess of $5,000.00 to the extent that such currency was acquired in violation of law.

In searching for data capable of being read, stored or interpreted by a computer(s), law enforcement personnel executing this search warrant will employ the following procedure:

a.  The government will begin by ascertaining whether all or part of the search of computers or other electronic equipment or media that is authorized in this warrant can be reliably completed at the site within a reasonable time. If the search can be so completed on site, the government will remove a computer or other piece of electronic equipment from the site only if necessary to preserve evidence or if the removed item is contraband or is a forfeitable instrumentality or fruit of the crime.

b.  If the government determines that a reliable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government will proceed to determine whether all or part of the authorized search can be completed by making mirror images of, or in some other manner duplicating, the contents of any computer or other electronic device, then completing the search of those contents off-site, e.g., at a law enforcement lab.

c.  The government may remove a computer or other electronic device to reliably and efficiently complete an off-site search. The government may also remove from the search location a computer or other electronic device if it determines that the item cannot within a reasonable period be searched reliably on site or by mirror-imaging or otherwise duplicating its contents for off-site examination. The government may also remove such an item if necessary to preserve evidence or if the item is contraband or is a forfeitable instrumentality or fruit of the crime.

d.  In conducting the search authorized by this warrant, whether on site or off site, the government will make all reasonable efforts to use methods and procedures that will locate and examine only those categories of files, documents or other electronically stored information that are identified in the warrant. The government may restore the image of original media and utilize the assistance of agents familiar with the case when searching for electronically stored information.

e.  Within the limitations described above and as part of the seizure of the aforementioned items, the searching agents may remove from the premises to be searched all computer hardware and related equipment, devices, disks, tapes, and other items, and all manuals or written information relating to the operation of the computer hardware, software, and related equipment as follows:
    (1) Computer hardware and computer related equipment;
    (2) Computer software and all other electronic, magnetic or other media capable of being read or interpreted by a computer or its related components, and information contained therein;

2

(3)  Electronically stored communications;

(4)  Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation or data;

(5)  Physical keys, encryption devices and similar physical items that are necessary to gain access to computer programs, data or other information or otherwise to render programs, data or other information into a readable or usable form;

(6)  Electronic devices such as Personal Digital Assistants (PDAs), cell phones or electronic organizers;

(7)  Routers, bridges, hubs or routers and all manuals associated with such equipment; and

(8)  Computer-related documentation consisting of written, recorded, printed or electronically stored material, which explain or illustrate how to configure or use computer hardware, software, or other related items.